## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

AHMED EISSA,

      Plaintiff,

v.

LEDVANCE LLC, KARSTEN FETTEN,
MARCI PIPER and ALAN BARLOW,

      Defendants

Case No.: 1:21-cv-11515

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

The Plaintiff, AHMED EISSA ("Plaintiff")vhereby submits his Opposition to the Motion to Dismiss served by the DEFENDANTS LEDVANCE, ALAN BARLOW, KARSTEN FETTEN, and MARCI PIPER ("Defendants"). The Plaintiff's detailed Complaint more than sufficiently alleges viable claims under the Massachusetts Parental Leave Act and G.L. c. 151B. Accordingly, the Defendants' motion should be denied.

## FACTUAL BACKGROUND

Accepting as true the allegations in Plaintiff's Complaint, the facts, which are quite extensive, are as follows. The Plaintiff is a male and a native of Egypt who was hired on August 30, 2018 as a Product Marketing Manager ("PM") for Defendant, Ledvance, LLC ("Defendant Ledvance"), a company that sells general lighting for lighting professionals as well as end users. For almost two years, the Plaintiff worked as a dedicated and successful PM. On August 7, 2020, just after the birth of his first child and shortly after returning from his paternity and Family Medical Leave ("FMLA"), Defendant Ledvance terminated him, despite his successful performance successfully managing one of the company's largest portfolios and despite the

absence of any negative performance review and/or discipline in his record.  Indeed, the terms and conditions of his employment had changed drastically in November 2019 when, after the October 2019 birth of his child, the Plaintiff sought to take advantage of the company's 12 week family leave/paternity leave. Plaintiff's Complaint, ¶¶ 6-14.

During a November 2019 meeting, Defendant Ledvance's Human Resources representative, Ms. Marci Piper ("Defendant Piper") met with the Plaintiff and  acknowledged that he was entitled to twelve (12) weeks of family leave under the company policy. However, when he approached her about his leave request, she expressly discouraged him from utilizing this benefit and discouraged him from being away from the company for the full 12 weeks.  She also informed him that the company did not specifically have a paternity leave policy. Plaintiff's Complaint, ¶¶ 6-14.

Defendant Piper also told the Plaintiff that no other male employee had previously taken a full 12 week paternity leave. When the Plaintiff had requested examples of other employees accommodating the company's needs, Defendant Piper responded that there was "not much precedence" for male employees taking time off.  Given the tenor of this discussion, the Plaintiff grew concerned and then bluntly asked her whether exercising his rights to take paternity leave would have adverse consequences on his employment. In response, Defendant Piper obliquely responded that, "Some people might wonder if the company really needs an employee if the company subsists without the employee for such a long period of time." Plaintiff's Complaint, ¶¶ 6-14.

The Plaintiff had specifically asked for a full, uninterrupted  paternity leave and all his emails with Defendants Piper and Alan Barlow, reiterated this request.  It was not – and never - a part-time work arrangement that translated into a request for intermittent leave.  The Plaintiff

sought a full leave opportunity so that he could truly experience the birth and joy of his first child without the interruption of his demanding and competing work obligations. Plaintiff's Complaint, ¶¶ 6-29.

The Plaintiff's request for full leave was made from the beginning of his discussions with Defendant Ledvance, as his email to Defendant Barlow, the individual overseeing all human resource and leave issues at Defendant Ledvance, and all his previous communications with Human Resources clearly illustrate.  Of additional import, never did the Defendants deny that any of these discussions occurred in the contemporaneous email exchanges they had with the Plaintiff on this subject.  At no point did the Plaintiff ask to work remotely full time for three (3) months. The Plaintiff did show willingness to do so, but only because he was concerned about his employment status, especially given his discussions with Defendants Piper and Karsten Fetten, his immediate supervisor.  Plaintiff's Complaint, ¶¶ 6-35.

Concerned, the Plaintiff reported these discussions to Defendant Barlow, but the Plaintiff's concerns were not ameliorated. Indeed, Defendant Barlow did not seek to refute any of the Plaintiff's contentions nor did he take any remedial action concerning Defendants Piper and Fetten's actions. Consequently, the Plaintiff did not want to do anything that would jeopardize his job. The remote work option was a compromise on his part because his preference had been not to work during his leave.  Plaintiff's Complaint, ¶¶ 6-35.

When Defendant Piper discouraged the Plaintiff from taking complete paternity leave and asked him to find an alternative arrangement, the Plaintiff told Defendant Fetten about that conversation and explained to him that he would be accommodating the company's needs even if it meant having to work full-time from Egypt. In his first conversation with Defendant Fetten about his leave request, the Plaintiff let him know that he would be taking leave towards year's end. The

Plaintiff never brought up wanting to be compensated while he was away on leave. Plaintiff's Complaint, ¶¶ 6-30.

When the Plaintiff agreed to work part-time during his leave, the agreement was that the majority of the load was going to shift to other employees and that he would act in a supporting role. This was communicated to the entire team and another team member, Mr. Francisco Garza, expressed interest in taking over some of his product. The Plaintiff talked to Defendant Fetten about this development and gave his opinion that he thought it was a good fit, given that Mr. Garza used to manage a large part of his portfolio before it was handed over to the Plaintiff. Plaintiff's Complaint, ¶¶ 6-39.

Defendant Fetten, however, never took action to transfer this shift in workload, and consequently, the Plaintiff continued to manage a full-time load on half, part-time pay during his intermittent paternity leave. The Plaintiff did not say anything at the time to Defendants because he was understandably concerned about losing his job and he was willing to do whatever he did to make sure he had a job to return to following his leave, especially given what they had told him before his leave that his job could be in jeopardy. In addition, Defendant Fetten also explicitly instructed the Plaintiff to only report part-time hours, even though he continued to carry the full-time load of his work responsibilities. Plaintiff's Complaint, ¶¶ 6-45.

During June 2020, Defendant Fetten  and Mr. Michael Amthor ("Mr. Amthor")(from Defendant Ledvance's Human Resources department) then had a call with the Plaintiff to discuss what would happen after the Plaintiff ran out of leave/FMLA hours and to discuss the current COVID-19 prohibition of international air travel.  During this discussion, Defendant Fetten blamed the Plaintiff for being stuck in Egypt and was extremely aggressive with him -  so much so that Mr. Amthor called the Plaintiff immediately after the call ended to check in on him because he

was surprised by Defendant Fetten's unnecessary and unprofessional aggressiveness. Plaintiff's Complaint, ¶¶ 6-57.

Just weeks after returning from his leave, the Plaintiff was unlawfully terminated. The reasons given by the Defendants for the Plaintiff's termination were false, inconsistent and manufactured.  At the time of his termination, the Plaintiff was one of seven employees terminated in a purported reduction in force, and to the best of his knowledge, the Plaintiff was the only PM who was involuntarily terminated after taking a leave. To include a PM in a reduction of force does not make sense for Defendant Ledvance.  The PM role is a position for which there is always demand for, and employers like the Defendants often find it difficult to fill. In fact, the demand for PMs is so great that the Defendants started moving engineers and bringing back retired employees just to fill the need.  Indeed, the Plaintiff was retained throughout two rounds of layoffs that occurred during 2019 because of this demand and because of his productivity. Additionally, these layoffs, and the 2020 layoff, primarily affected support functions like manufacturing, engineering and supply chain positions, rather than positions like the Plaintiff's. Plaintiff's Complaint, ¶¶ 6-57.

Indeed, the Defendants were rehiring for the Plaintiff's same position within a couple of months after terminating him. Moreover, they continue to have even a present need for that position as well based on a recent and second job posting for his PM position following his layoff. The other shifting reason the Defendants provide for the Plaintiff's inclusion in the layoff was his performance. However, no documentation supports any negative assessment of his performance. The Plaintiff excelled in his role and received favorable reviews for his performance from his colleagues and his superiors. Meanwhile, the Plaintiff was terminated and his female colleagues -

who received a full 8 week and/or 12 week uninterrupted maternity leave - were not.  Plaintiff's Complaint, ¶¶ 6-57.

## STANDARD OF REVIEW

The Supreme Court does not require heightened fact pleading in employment discrimination cases; "a complaint need only allege enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 569-570 (2007), *citing Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 508, 512, 514 (2002)). "In order to defeat a Fed. R. Civ. P. 12(b)(6) motion, a complaint must contain 'enough facts to raise a reasonable expectation that discovery will reveal evidence' supporting the  claims." *Fantini v. Salem State Coll.,* 557 F.3d 22, 26 (1st Cir. 2009), *quoting Twombly, s u p r a*  at 556.

## ARGUMENT

**I.**     **THE DEFENDANTS' ARGUMENTS ATTACKING THE PLAINTIFF'S MASSACHUSETTS PARENTAL LEAVE ACT ("MPLA") CLAIM ARE MERITLESS.**

The Defendants summarily contend that because the Plaintiff took his paternity leave two months following the birth of his child, it was not timely. The Defendants, however, cite no binding Massachusetts authority to support this contention.  And that is because there is none.  Indeed, the pertinent MPLA statute, G.L. c. 149, § 105D(b), makes no mention of any such requirement.  G.L. c. 149, § 105D(b).  The Defendants nonetheless reference an MCAD regulation's that such leave should not be "substantially later" following the birth of a child as grounds for denial of the Plaintiff's MPLA claim. Such contention, however, is unpersuasive.

The Defendants cannot show that the Plaintiff's request for paternity leave three weeks following the birth of his child (and undisputed by the Defendants), or his taking leave beginning in December 2019, was "substantially later" than the birth of his child.  The Plaintiff's child was

born on October 26, 2019, and only three weeks later, the Plaintiff met with Defendant Piper and promptly requested paternity leave from the Defendants. His request was prompt, timely and well within the parameters of the MPLA, especially when it is considered that leave requests are also provided for parents who adopt their children.  It has long been recognized that adoptions do not always occur immediately upon the birth of that child. *See* G. L. c. 149, § 105D.

Moreover, the Guidance provided by MCAD contemplates leave that occurs weeks after the birth or adoption of a child. *See* Defendants' Exhibit D, MCAD Guidance. For example, the guidance explains the following: "Absence for "the purpose of giving birth" as used in the MMLA refers to absence from work for the purpose of preparing for or participating in the birth or adoption of a child, and caring for a newborn or newly adopted child." *Id.*

Furthermore, the Plaintiff is aware of no case or other authority that has interpreted the statute or regulation in such a narrow and restrictive manner as that advanced by the Defendants. Such an interpretation violates a fundamental tenet of statutory interpretation of remedial statutes such as the MPLA and G.L. c.151B.[1]  That is,  there is an explicit legislative directive that the MPLA and "the provisions of c. 151B 'shall be construed liberally' for the accomplishment of the remedial purposes of the statute." *Dahill v. Police Dep't of Boston*, 434 Mass. 233, 240 (2001), *quoting* G. L. c. 151B, § 9; *see also Charland v. Muzi Motors, Inc.,* 417 Mass. 580, 583 (1994), and G. L. c. 151B, § 9 ("One of the principal purposes of G. L. c. 151B is to 'protect the citizens of the Commonwealth against employment discrimination,' . . . and its provisions are to be 'construed liberally for the accomplishment' of that purpose"); *Thurdin v. SEI Boston*, LLC, 452 Mass. 436, 441 (2008).   The Defendants' interpretation, however, runs contrary to these

---

[1] .   Indeed, a violation of the MPLA constitutes a violation of the Massachusetts anti-discrimination law, Chapter 151B.  The remedies available to an employee who is denied rights under the MPLA are the same as those available to an employee who suffers employment discrimination under Chapter 151B.  See *Global NAPS, Inc. v. Awiszus*, 475 Mass. 489, 496-97 (2010).

fundamental principles.[2]   Against this backdrop, the Plaintiff has stated a plausible MPLA claim

for relief.

## II.     THE EVIDENCE ALSO SUPPORTS A FINDING OF INDIVIDUAL LIABILITY AGAINST THE INDIVIDUAL DEFENDANTS.

Chapter 151B § 4(5) prohibits "any person, whether an employer or an employee or not, to

aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter or to

attempt to do so." Liability for aiding and abetting discrimination extends to "individuals,

including co-employees of the allegedly aggrieved employee." *Chapin v. Univ. of Mass. at Lowell*,

977 F. Supp. 72, 78 (D. Mass. 1997). Under this theory of liability, an individual may be held

separately liable if he actively and intentionally provides substantial, supporting assistance to

intentional conduct that is prohibited by chapter 151 B. *Planned Parenthood League of Mass.,*

*Inc. v. Blake*, 417 Mass. 467, 481 (1994). Given the Plaintiff's allegations of the substantial,

supporting assistance provided by Defendants Fetten, Piper and Barlow in discriminating against

the Plaintiff, viable liability attaches against each of them for aiding and abetting.

To prevail on an aiding and abetting claim, a plaintiff must show (1) that the defendant

committed a wholly individual and distinct wrong that is separate and distinct from the claim in

main; (2) that the aider or abetter shared an intent to discriminate not unlike that of the alleged

principal offender; and (3) that the aider or abetter knew of his or her supporting role in an

enterprise designed to deprive the plaintiff]of a right guaranteed him or her under G.L. c. 151B.

*Lopez v. Com., 463 Mass. 696, 713 (2012); see also Ping Zhao v. Bay Path Coll.*, 982 F.Supp.2d

104, 115-116 (D. Mass. 2013). Contrary to the Defendant's assertions, there is more nuance to

what constitutes a "separate and distinct" act.  For example, a manager's role in a workplace

---

[2] The Defendants' reference to *Global NAPS, Inc. v. Awiszus*, 475 Mass. 489, 496-97 (2010) does not alter this conclusion.  That decision does not address the legal issue present here nor does it bear any resemblance to the facts of this case.  Indeed, there was no discussion of the statutory phrase, "substantially later." *Id.*

investigation, or lack thereof, involving the complainant and/or his claims of discrimination may qualify as a separate and distinct act. *See id.*; *see also Semmami v. UG2 LLC,* No. 18-cv-12396-DJC, 16 (D. Mass. May. 24, 2019)(Casper, J.) ("Semmami has also alleged that UG2 knew about Correia's harassment and either failed to act or conducted a sham investigation, enabling the behavior to continue."). Further, allegations of incidents which by nature require multiple actors can establish joint activity sufficient for claims of aiding and abetting. *Fisher v. Town of Orange*, 885 F.Supp.2d 468, 477 (D. Mass. 2012) (allegations of pranks, verbal harassment, and rumor spreading sufficient to establish "joint activity" and survive motion to dismiss under s. 4(5)).

Here, the Plaintiff's allegations against Defendant Barlow more than meet these requirements. The Defendants mistakenly contend that the Plaintiff's allegations against Defendant Barlow are based strictly on his email exchange with the Plaintiff and that such allegations are insufficient to sustain his aiding and abetting claim. Such argument, however, greatly misconstrues the Plaintiff's Complaint and misapplies the correct 12(b)(6) standard. The Plaintiff's allegations in his Complaint extend well beyond the email exchange with the Plaintiff.

Indeed, the Complaint alleges that Defendant Barlow, as the Vice President of Defendant Ledvance's Human Resources Department, was charged with the responsibility of reviewing and either approving or denying employee leave requests as well as employee terminations and/or layoffs. In this capacity, Defendant Barlow knew or should have known that the Plaintiff's leave was being encumbered and interfered with unlawfully, especially since the Plaintiff communicated directly with Defendant Barlow about these events as they were occurring in person and via email. Defendant Barlow, however, failed to act, failed to investigate and failed to protect the Plaintiff from discrimination and/or retaliation, thereby giving rise to his individual liability. *See Semmami, supra*.

Indeed, in the email communication provided by the Defendants, the Plaintiff summarized to Defendant Barlow the discussion he had with Defendant Marci Piper after he indicated his interest in taking the 12 week paternity leave and stated as follows:

> "She encouraged me to explore alternative work arrangements with my manager that would accommodate for my family's **needs and at the same time mitigate the potential impact of my absence on work.** I asked for examples of what possible arrangements might look like based on precedence, and she informed me that there was not much precedence to draw upon."

See Defendants' Exhibit A to Defendants' Motion to Dismiss (emphasis added).  Within such communication, the Plaintiff made it abundantly clear to Defendant Barlow that Defendant Piper discouraged his use of the full 12 week paternity leave, and also told him that no other male employee had taken a full 12 week paternity leave. In addition, he states the following:

> "I asked about whether this decision might have adverse consequences for my prospects with the company, and **she responded that some people might wonder if the company can survive for that period without someone, whether the company really needs him/her."**

See id. (emphasis added).

At that point, Defendant Barlow was also aware that Defendant Piper told the Plaintiff that his job would not be protected if he took advantage of a full 12 week paternity leave. Indeed, as the Plaintiff soon found out, his job was not protected after all following his leave.  Despite learning of these developments, Defendant Barlow did not conduct any investigation and did not address any of these statements by Defendant Piper.  Defendant Barlow also did not tell the Plaintiff that Defendant Piper was unlawfully interfering with his right to leave and/or discriminating against him. Defendant Barlow also did not even acknowledge that Defendant Piper was mistaken, or that he "misinterpreted" Defendant Piper.[3]

---

[3] Notably, during his employment the Plaintiff never received any communication from Defendant Piper indicating that he misinterpreted her statements.

In addition, the Plaintiff also alleges in his Complaint that he reported his discouraging discussion with his supervisor, Defendant Fetten, to Defendant Barlow, and once again, Defendant Barlow took no action to rectify this misconduct. In the Plaintiff's email, he reported that Defendant Fetten had informed him that his decision to take paternity leave would " 'have consequences' " and that a " ' decision will have to be made' " by the company.  Yet, Defendant Barlow failed to take any remedial action or conduct any investigation whatsoever.

The Plaintiff also highlighted in this email correspondence to Defendant Barlow that he had no intention of working during his leave, but was only considering that option because of his concern for his continued employment given his disconcerting discussions with Defendants Piper and Fetten. Indeed, the Plaintiff explains the following:

> "I reiterate that commitment to you now, and that I am willing to consider changing travel arrangements and/or work more hours when I am away to support the business. I do that out of my commitment to the company and eagerness to continue building on the work I have put so far into the products I manage. I also do that on the assumption that I will get a chance to come back and resume my current position at end of the paternity leave.
>
> ***My conversation with Karsten this morning makes me question whether that will be possible.*** It would be a whole different set of considerations that my wife and I need to deliberate ***if my employment with the company is at stake***. I would like some clarity from you on this issue and guidance on how to move forward given the very short time left before our planned travel."

*Id.* (emphasis added). Once again, however, Defendant Barlow did not respond to the Plaintiff's concerns or rectify this mistreatment, but instead, facilitated this continuing course of disparate treatment. Moreover, he knew and/or should have known that the Plaintiff's termination shortly after and in retaliation for his leave was in contravention of statutory and regulatory requirements. Defendant Barlow, once again, however, failed to correct this unlawful act.

Overall, the Plaintiff's allegations establish that Defendant Barlow not only acquiesced and failed to assist the Plaintiff, but also failed to investigate the misconduct as the leading authority

in the Human Resources department, rendering him individually liable under G.L. c. 151B. *See Chapin, supra* at 80; *see also Jorge v. Silver City Dodge*, 15 MDLR 1518, 1531 (1993), *quoting Munford v. James T. Barnes Co*., 441 F. Supp. 459, 466 (E.D. Mich. 1977) ("`[f]ailure to investigate gives tacit support to the discrimination because the absence of sanctions encourages abusive behavior.' "); *Przybycien v. Aid Maintenance Co.,* 13 MDLR 1266, 1283 (1991) (same). Liability also attaches against supervisors individually for aiding and abetting discrimination because of their acquiescence in a retaliatory firing of an employee who complains of discrimination. *See Hope v. San Ran, Inc*., 8 MDLR 1195, 1211 (1986). Such acquiescence constitutes a "separate, illegal act[ ] of aiding and abetting discrimination" sufficient to hold an individual employee, such as Defendant Barlow, personally liable. *Id.* at *17. All in all, the litany of allegations against Defendant Barlow more than sufficiently establish "separate and distinct acts" well beyond his email exchange with the Plaintiff that render him liable.  In addition, his joint activity with Defendant Piper and Defendant Fetten also give rise to his individual liability for aiding and abetting under G.L. c. 151B.  *See Fisher, supra* at 477.

Indeed, the Plaintiff's allegations surrounding the joint efforts of Defendants Barlow, Fetten and Piper in denying and interfering with the Plaintiff's leave request and treating him differently from his female colleagues, combined with their joint efforts in taking adverse employment actions against him during his employment and ultimately selecting him for termination, more than adequately allege Defendants' Fetten and Piper's aiding and abetting liability under G.L.c. 151B.  *See Fisher, supra* at 477 (plaintiff's allegations of "joint activity" defeated defendants' motion to dismiss aiding and abetting discrimination claim).  As detailed above, Defendant Fetten's own individual actions adversely affected the Plaintiff's employment and ultimately resulted in his wrongful termination. He deprived the Plaintiff of the opportunity

for unfettered leave.  He required the Plaintiff to work full-time during his leave, and yet, only paid him for part-time hours. He also treated him disparately from his other colleagues and subsequently selected him for termination, manufacturing false and inconsistent reasons to justify his termination. Defendant Piper also substantially facilitated the interference with the Plaintiff's leave request and his termination, and as a Human Resources representative, she also failed to properly investigate the unlawful actions. Contrary to the Defendant's assertions, the Plaintiff's Complaint sufficiently alleges acts giving rise to Defendants Piper's and Fetten's individual liability well beyond the denial of his leave request and sufficient to defeat a motion to dismiss.

Discovery will also likely reveal additional evidence showing additional distinct acts these Defendants took on their own in order to aid Defendant Ledvance in discriminating and retaliating against the Plaintiff.  Therefore, it would be premature to dismiss the Plaintiff's claims[4] against these individual defendants. *See Ping Zhao, supra* at 116; *cf. Fisher, supra* at 477.[5]

### III.   THE PLAINTIFFS' FMLA CLAIM AGAINST DEFENDANT BARLOW IS ALSO VIABLE.

For the reasons discussed in Section II of this Memorandum, the Plaintiff's Family Medical Leave Act claim is also viable against Defendant Barlow. The Plaintiff has sufficiently

---

[4] In their motion, the Defendants do not contend that the Plaintiff cannot state viable G.L. c. 151B claims of interference against Defendants Barlow, Fetten and Piper. To the extent that their motion can be construed otherwise, the Plaintiff submits that such argument cannot prevail.  To establish a claim for interference under c. 151B, § 4(4A) against the individual defendants, the Plaintiff must show that they interfered with his rights in deliberate disregard of them. *Runyon v. Wellington Mgmt.Co. LLP*, 2015 WL 1276825, *6 (2015), citing *Furtado v. Standard Parking Corp.*, 820 F.Supp.2d 261, 278–79 (D. Mass. 2011).  Deliberate disregard requires an intent to discriminate. *Canfield v. Con–Way Freight, Inc.*, 578 F.Supp.2d 235, 242 (D. Mass. 2008).  However, the element of intentionality is satisfied where a defendant knowingly interfered with the employee's right to be free from discrimination. *Runyon*, 2015 WL 1276825, *6, citing *McLaughlin v. City of Lowell*, 84 Mass. App. Ct. 45, 73 (2013).  Here, the same core set of facts related to the individual defendants as set forth above also establish the basis to conclude that they intentionally interfered with the Plaintiff's rights to be free from discrimination.  The Complaint's allegations similarly show an intent to interfere with the Plaintiff's right to take paternity leave and receive the same benefits as his female colleagues.  Accordingly, the Plaintiff has alleged viable claims under G.L. c. 151B, §4(4A).

[5] In Count IV, the Plaintiff also clarifies that he does not allege individual liability under Title VII, only under G.L.c. 151B.

alleged conduct by Defendant Barlow that gives rise to individual liability under the FMLA. For the Defendants to contend otherwise results from a misreading of the Complaint and the 12(b)(6) standard.

### IV. THE DEFENDANTS' WRONGFUL CONDUCT ALLEGED IN COUNTS I THROUGH IV PROPERLY INCLUDE CONDUCT OCCURRING BEFORE JANUARY 5, 2020.

The Defendants are also mistaken that any alleged wrongful conduct before January 5, 2020 is time-barred. The wrongful conduct during this time period, including (i) Defendant Piper's statements on November 14, 2019 and Defendant Fetten's on November 19, 2019, respectively, and (ii) the discriminatory failure by Defendants to grant him a leave of absence under the MPLA (which he sought in November 2019 and began on December 30, 2019), comprise part of a continuing pattern of discriminatory conduct against the Plaintiff, and therefore, is timely.

All of this conduct unquestionably relates to the Plaintiff's request for leave, the unlawful interference with it as well as the retaliation for it. Such conduct ultimately must be viewed in its totality in order to assess adequately its discriminatory and retaliatory nature and impact. Such conduct is also admissible under the continuing violation doctrine, which is embodied in regulations promulgated by MCAD, namely 804 CMR §1.04(3). That regulation, in pertinent part, provides that a "complaint may be filed . . . at any time within three hundred days after the alleged unlawful conduct; provided, however, that the requirement shall not be a bar to filing in those instances where facts are alleged which indicate that the unlawful conduct complained of is of a continuing nature. . . ." *Id.*

This exception explicitly "recognizes that some claims of discrimination involve a series of related events that have to be viewed in their totality in order to assess adequately their discriminatory nature and impact." *Cuddyer v. Stop & Shop Supermarket Co.,* 434 Mass. 521, 531

(2001). Massachusetts has long applied this rule to discrimination claims. *See Clifton v. Massachusetts Bay Transp. Auth.,* 445 Mass. 611, 616–617 (2005); *Cuddyer, supra* at 531. This continuing violation doctrine allows MCAD and the court to anchor and validate claims based on earlier events which are technically outside the statute of limitations, providing the "alleged events are part of an ongoing pattern of discrimination," and at least one event is within the applicable limitations period. *Cuddyer, supra* at 532.

Massachusetts courts have adopted "the continuing violation doctrine as an exception to the limitations periods in chapter 151B." *DaCosta v. Town of Plymouth*, No. 11-cv-12133, 2014 WL 2998986, at *15 (D. Mass. July 1, 2014, *citing quoting Noviello v. City of Bos.,* 398 F.3d 76, 86 (1st Cir. 2005). The Massachusetts Supreme Judicial Court (the "SJC") has recognized that "in certain discrimination cases arising under G.L. c. 151B, § 4, . . . the continuing violation doctrine permits plaintiffs to recover for damages occurring outside the limitations period as long as 'there is a discrete violation within the [statute of] limitations period to anchor the earlier claims.'" *Crocker v. Townsend Oil Co., Inc.*, 464 Mass. 1 (2012) (alteration in original), *quoting Cuddyer, supra* at 531. Further, the "alleged timely discriminatory acts [must] have a substantial relationship to the alleged untimely discriminatory acts." *Ocean Spray Cranberries, Inc. v. Mass. Comm'n Against Discrimination*, 441 Mass. 632 (2004). Lastly, a plaintiff generally must show that "earlier violations outside the [] limitations period did not trigger [the plaintiff's] 'awareness and duty' to assert his rights, i.e., that [the plaintiff] could not have formed a reasonable belief at the time the employment actions occurred that they were discriminatory." *Id.* at 266–67.

Similarly, "[u]nder Title VII . . ., the continuing violation doctrine 'allows an employee to seek damages for otherwise time[-]barred allegations if they are deemed part of an ongoing series of discriminatory acts and 'there is some violation within the statute of limitations period that

anchors the earlier claims.'" *DaCosta, supra* at *14, *quoting Loubriel v. Fondo del Segundo del Estado*, 694 F.3d 139, 144 (1st Cir. 2012). "To qualify as an anchoring act, the discriminatory act must 'substantially relate[ ] to [the] earlier incidents of abuse.'" *Lockridge v. The Univ. of Me. Sys.*, 597 F.3d 464, 474 (1st Cir. 2010) (alterations in original), *quoting Noviello, supra at* 86. The doctrine applies 'to discriminatory conduct that takes place over a series of days or perhaps years.'" *DaCosta*, *supra* at *15 (citations and internal quotation marks omitted), *quoting Tobin v. Liberty Mut. Ins. Co.*, 553 F.3d 121, 130 (1st Cir. 2009).

Here, the allegations in the Plaintiff's Complaint establish unequivocally that the subject conduct including (i) Defendant Piper's statements on November 14, 2019 and Defendant Fetten's statements on November 19, 2019, respectively, and (ii) the discriminatory failure by Defendants to grant the Plaintiff an unfettered leave of absence under the MPLA all involve a continuing series of events that are necessarily and factually interrelated and intertwined with the unlawful interference with his paternity leave and Plaintiff's unlawful termination, all unlawful acts within the limitations period. Such allegations, with all reasonable inferences drawn in the Plaintiff's favor, sufficiently tie into a broader pattern of discriminatory conduct that are all substantially related. Indeed, they constituted a continuing course of discriminatory conduct that ultimately culminated in the Plaintiff's unlawful termination. Accordingly, dismissal of the Plaintiff's claim based on conduct prior to January 5, 2020 is wholly inappropriate at this time.

**V.    THE PLAINTIFF HAS ALSO SUFFICIENTLY ALLEGED THE REQUSIITE MALICE TO SUSTAIN HIS CLAIM OF INTENTIONAL INTERFERENCE WITH CONTRACTUAL/ADVANTAGEOUS RELATIONS AGAINST DEFENDANTS PIPER, FARSTEN AND BARLOW.**

The Defendants' contentions attacking the Plaintiff's intentional interference with contractual/advantageous relations claim are unpersuasive because he has adequately alleged the Defendants' "actual malice." When the Plaintiff's Complaint is read in a light most favorable to him,

numerous factual allegations plausibly suggest that the conduct of Defendants Piper, Fetten and Barlow was indicative of discriminatory as well as a malicious intent, the result of which interfered with Plaintiff's employment and future career opportunities with Defendant Ledvance. *See, e.g., Comey v. Hill*, 387 Mass. 11, 19-20 (1982) (action based on age discrimination supported a jury verdict for the plaintiff on intentional interference claim); *see also Tuli v. Brigham & Women"s Hospital*, 656 F.3d 33, 43 (1st Cir. 2011) (same); *Blackstone v. Cashman*, 448 Mass. 255, 260 (2007) (same); (reversing grant of summary judgment where there was evidence that defendants subjected plaintiff to pattern of age discrimination, causing her to resign from her job).

Additionally, it has long been recognized that the Plaintiff's allegations of retaliatory conduct by the individual defendants satisfies the "actual malice" requirement for interference claims. *See Zimmerman v. Direct Fed. Credit Union*, 262 F.3d 70 (1st Cir. 2001) (holding that retaliatory animus satisfies the "male" showing for intentional interference claims); *Caloia v. Putnam Invs.*, LLC, CIVIL ACTION NO. 11-10073-RWZ, 8 (D. Mass. Aug. 21, 2012) ("However, "the elements underlying a claim for unlawful retaliation may be used to show malice when a tortious interference claim is brought against a supervisor in a loss-of-employment case."). Accordingly, dismissal of the Plaintiff's claim should be denied.

## VI.   THE WORKERS' COMPENSATION STATUTE ("WCA") DOES NOT BAR THE PLAINTIFF'S INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIMS.

Contrary to the Defendants' assertions, the WCA does not bar the Plaintiff's intentional infliction of emotional distress claims against his former co-workers, Defendants Piper, Barlow and Piper, whose retaliatory conduct was not in furtherance of their employer's interest. As the Honorable Rya W. Zobel has observed, "[i]ntentional torts which are `in no way within the scope of employment furthering the interests of the employer' are not barred by the [WCA] because they

are not an accepted risk of doing business." *Foley v. Proctor Gamble Distributing Company*, C.A. 01-11314-RWZ, 2003 WL 21696544, at *4 (D. Mass. Jul. 21, 2003), *quoting O'Connell v. Chasdi*, 400 Mass. 686, 690 (1987)("[w]here a fellow employee commits an intentional tort not related to the interests of the employer . . . the policies behind the act would not be served by immunizing the coemployee"); *see also Brown v. Nutter, McClennen & Fish*, 45 Mass. App. Ct. 212, 216 (1998).

In *Packard v. Commonwealth Exec. Office of Pub. Safety*, 2011 U.S. Dist. LEXIS 111055 (D. Mass. Sept. 28, 2011), for example, this Court held that a plaintiff's termination arising out of retaliatory animus by a coworker was not barred by the WCA because the decision was not made in furtherance of employer's interests. *Id.* The *Packard* court reasoned that the WCA's exclusivity provisions do "not immunize [the defendant] from [a plaintiff's] claim of intentional infliction of emotional distress if his [the defendant's] alleged tortious conduct . . . did not further [MEMA's] interest." *Brown*, *supra* at 216 (interpreting *Packard*).

The *Packard* court also rejected the defendants' reliance on *Green v. Wyman-Gordon Co.,* 422 Mass. 551 (1996), and such reasoning applies here with equal force:  "The case of *Green v. Wyman-Gordon Co.,* 422 Mass. 551, 664 N.E.2d 808 (1996), cited by the defendants in their brief, does not suggest that the exclusivity provisions of the Workers' Compensation Act immunize fellow employees from liability for intentional torts where the tortious conduct is unrelated to the employer's interests. In that case, the Massachusetts Supreme Judicial Court determined that the exclusivity provisions of the Act bar emotional distress claims against an employer that arise out of the actions of a fellow employee. *See Green*, 422 Mass. at 558-59, 664 N.E.2d at 813. However, it did not address the situation presented in this case, where the plaintiff brings such claims directly

against the co-employee tortfeasor." *Packard, supra* at *28 n.7. For these same reasons, the Defendants' reliance on *Green* is misplaced.[6]

Here, the allegations presented by the Plaintiff, if proven, would establish that the Defendants' actions to discriminate and retaliate against him with respect to his paternity leave request, his adverse employment actions and his termination were based on discriminatory and/or retaliatory animus rather than on any intent or effort to serve his employer's interests, especially where he provided positive contributions to his employer as a high performer. *See O'Connell*, *supra* at 690. On this basis alone the Defendants' motion must be denied. Beyond that, "any judgment as to [Plaintiff]'s ability to prove any set of facts demonstrating that [the individual defendants] w[ere] acting neither within the course of [their] employment nor in furtherance of [their] employer's interest" would appear to be "premature." *Foley*, *supra* at *4, *citing Brown*, *supra* (emphasis added). *Cf. Horney*, 95 F. Supp. 2d at 37 (allowing emotional distress claims to survive Rule 12(b)(6) motion to dismiss since there was "not yet enough information to determine whether both [the defendant] and [the plaintiff] were acting within the course of their employment when the torts allegedly occurred, or if anything they were doing was related to the interests of [their employer]"). Accordingly, the Defendants cannot prevail on their motion to dismiss.[7]

---

[6] In this ever-evolving area of the law, numerous other cases have drawn similar conclusions and held that claims based on a co-employee's alleged intentional conduct were not barred by the WCA. *See, e.g., Pettengill v. Curtis*, 584 F. Supp. 348 (D. Mass. 2008) (exclusivity provision of WCA did not bar claim for negligent infliction of emotional distress based on sexual abuse); *Bourbeau v. City of Chicopee*, 445 F. Supp. 2d 106 (D. Mass. 2006) (motion for summary judgment denied as to claim of intentional infliction of emotional distress where it was premature to determine whether coworker was acting within the scope of his employment); *Cushing v. Gaw*, No. 081043D, 2010 Mass. Super. LEXIS 82 (Super. Ct. Mar. 16, 2010) (where defendant fabricated charges of sexually inappropriate behavior against plaintiff and acted out of personal animus, such acts were unrelated to interests of town and claims for intentional infliction of emotional distress and intentional interference with contractual relations were not barred by WCA).

[7] This Court should also reject any effort by the Defendants to seek dismissal based on a purported failure to exhaust administrative remedies. The Plaintiff has clearly satisfied all administrative prerequisites and the Defendants cannot contend otherwise. Indeed, they themselves concede in their motion that the Plaintiff previously filed his claims before the MCAD before transferring his claims to the Superior Court. *See* Defs. Motion to Dismiss, at p.3.

## VII. PLAINTIFF'S ALLEGATIONS IN COUNT NINE ARE ALSO SUFFICIENT TO WITHSTAND DISMISSAL.

Drawing all reasonable inferences in the Plaintiff's favor, this Court must deny the Defendants' effort to dismiss the Plaintiff's claim based on the breach of the implied covenant of fair dealing. The Plaintiff's Complaint does sufficiently allege that the Defendants' conduct deprived the Plaintiff of compensation, including bonus monies which would have been due had he remained employed. *Gram v. Liberty Mutual Insurance*, 384 Mass. 659 (1984). Accordingly, the Defendants' motion should be denied.

## IX. CONCLUSION

Based on the foregoing and any other matters stated orally to the Court, the Plaintiff respectfully requests that this Court deny the Defendants' Motion to Dismiss.

DATED: October 20, 2021

Respectfully submitted,

AHMED EISSA

By his Attorney,

/s/   Helen G. Litsas

_____

Helen Litsas (BBO #644848)
LAW OFFICE OF HELEN G. LITSAS
22 Mill Street, Suite 408
Arlington, MA 02476
Phone: (617) 596-5561
helen@litsaslaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on October 20, 2021, a copy of the foregoing document was filed electronically through the Court's ECF system on the following counsel for Defendants:

Stéphanie Smith, Esq.
Casner & Edwards, LLP
303 Congress Street
Boston, Massachusetts 02210

/s/    Helen G. Litsas
Helen G. Litsas