UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AHMED EISSA,<br><br>      Plaintiff,<br><br>v.<br><br>LEDVANCE LLC, KARSTEN FETTEN,<br>MARCI PIPER and ALAN BARLOW,<br><br>      Defendants | Case No.: 1:21-cv-11515 |

**PLAINTIFF AHMED EISSA'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO AMEND AND/OR ALTER JUDGMENT PURSUANT TO FED. R. CIV. P. 59 AND 60**

The Plaintiff, AHMED EISSA ("Plaintiff") hereby submits his Motion for Reconsideration and/or Motion to Amend and/or Alter Judgment to correct errors contained in the Court's August 17, 2022 decision dismissing certain claims from the Plaintiff's Complaint ("Decision") following a partial motion to dismiss filed by DEFENDANTS LEDVANCE, ALAN BARLOW, KARSTEN FETTEN, and MARCI PIPER ("Defendants"). As grounds for said motion, the Plaintiff states that various errors of law and fact in the Decision warrant reversal of the Defendant's grant of dismissal on certain claims. Accordingly, the Plaintiff's motion should be allowed

**STANDARD OF REVIEW**

Under Fed. R. Civ. P. 59(e), a party may file a motion to alter or amend a judgment within 28 days after entry of the judgment and "direct the district court's attention to newly discovered material evidence or a manifest error of law or fact . . . enabl[ing] the court to correct its own errors." *Aybar v. Crispin-Reyes*, 118 F.3d 10, 15 (1st Cir. 1997). In the First Circuit, amendment of a judgment is warranted only when: (1) the moving party presents newly discovered evidence

that is material to the court's decision; (2) there has been an intervening change in the law; or (3) the earlier decision was based on a manifest error of law or was clearly unjust. *See United States v. Allen*, 573 F.3d 42, 53 (1st Cir. 2009)

A court has discretionary authority to amend its prior decision. *See Weber v. Roadway Exp., Inc.*, 199 F.3d 270, 276 (5th Cir. 2000). Fed. R. Civ. P. 60(a) further provides that "[t]he court may correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record. The court may do so on motion or on its own, with or without notice." Under Fed. R. Civ. P. 60(b), the Court may relieve a party from a final judgment or order if a mistake was made or any other reason that justifies relief. Within this analytical framework, allowance of the Plaintiff's motion is required because of the Decision's various errors of law and fact.

## FACTUAL BACKGROUND

Accepting as true the allegations in Plaintiff's Complaint, the facts, which are quite extensive, are as follows. The Plaintiff is a male and a native of Egypt who was hired on August 30, 2018 as a Product Marketing Manager ("PM") for Defendant, Ledvance, LLC ("Defendant Ledvance"), a company that sells general lighting for lighting professionals as well as end users. For almost two years, the Plaintiff worked as a dedicated and successful PM. On August 7, 2020, just after the birth of his first child and shortly after returning from his paternity and Family Medical Leave ("FMLA"), Defendant Ledvance terminated him, despite his successful performance successfully managing one of the company's largest portfolios and despite the absence of any negative performance review and/or discipline in his record. Indeed, the terms and conditions of his employment had changed drastically in November 2019 when, after the October

2019 birth of his child, the Plaintiff sought to take advantage of the company's 12 week family leave/paternity leave. Plaintiff's Complaint, ¶¶ 6-14.

During a November 2019 meeting, Defendant Ledvance's Human Resources representative, Ms. Marci Piper ("Piper"), who was responsible for overseeing Ledvance's human resource and personnel matters, met with the Plaintiff and acknowledged that he was entitled to twelve (12) weeks of family leave under the company policy. However, when he approached her about his leave request, she expressly discouraged him from utilizing this benefit and discouraged him from being away from the company for the full 12 weeks. She also informed him that the company did not specifically have a paternity leave policy. Plaintiff's Complaint, ¶¶ 6-14.

Piper also told the Plaintiff that no other male employee had previously taken a full 12 week paternity leave. When the Plaintiff had requested examples of other employees accommodating the company's needs, Piper responded that there was "not much precedence" for male employees taking time off. Given the tenor of this discussion, the Plaintiff grew concerned and then bluntly asked her whether exercising his rights to take paternity leave would have adverse consequences on his employment. In response, Piper obliquely responded that, "Some people might wonder if the company really needs an employee if the company subsists without the employee for such a long period of time." Plaintiff's Complaint, ¶¶ 6-14.

The Plaintiff had specifically asked for a full, uninterrupted paternity leave and all his emails with Piper and Alan Barlow, reiterated this request. It was not – and never - a part-time work arrangement that translated into a request for intermittent leave. The Plaintiff sought a full leave opportunity so that he could truly experience the birth and joy of his first child without the interruption of his demanding and competing work obligations. Plaintiff's Complaint, ¶¶ 6-29.

The Plaintiff's request for full leave was made from the beginning of his discussions with Ledvance, as his email to Barlow, the individual overseeing all human resource, personnel and leave issues at Ledvance, and all his previous communications with Human Resources clearly illustrate. Of additional import, never did the Defendants deny that any of these discussions occurred in the contemporaneous email exchanges they had with the Plaintiff on this subject. At no point did the Plaintiff ask to work remotely full time for three (3) months. The Plaintiff did show willingness to do so, but only because he was concerned about his employment status, especially given his discussions with Piper and Karsten Fetten, his immediate supervisor. Plaintiff's Complaint, ¶¶ 6-35.

Troubled by this turn of events, the Plaintiff reported these discussions to Barlow, a leading official on personnel matters, but the Plaintiff's concerns were not ameliorated. Indeed, Barlow did not seek to refute any of the Plaintiff's contentions nor did he take any remedial action concerning Piper and Fetten's actions. Consequently, the Plaintiff did not want to do anything that would jeopardize his job. The remote work option was a compromise on his part because his preference had been not to work during his leave. Plaintiff's Complaint, ¶¶ 6-35.

When Piper discouraged the Plaintiff from taking complete paternity leave and asked him to find an alternative arrangement, the Plaintiff told Fetten about that conversation and explained to him that he would be accommodating the company's needs even if it meant having to work full-time from Egypt. In his first conversation with Fetten about his leave request, the Plaintiff let him know that he would be taking leave towards year's end. The Plaintiff never brought up wanting to be compensated while he was away on leave. Plaintiff's Complaint, ¶¶ 6-30.

When the Plaintiff agreed to work part-time during his leave, the agreement was that the majority of the load was going to shift to other employees and that he would act in a supporting

role. This was communicated to the entire team and another team member, Mr. Francisco Garza, expressed interest in taking over some of his product. The Plaintiff talked to Fetten about this development and gave his opinion that he thought it was a good fit, given that Mr. Garza used to manage a large part of his portfolio before it was handed over to the Plaintiff. Plaintiff's Complaint, ¶¶ 6-39.

Fetten, however, never took action to transfer this shift in workload, and consequently, the Plaintiff continued to manage a full-time load on half, part-time pay during his intermittent paternity leave. The Plaintiff did not say anything at the time to Defendants because he was understandably concerned about losing his job and he was willing to do whatever he did to make sure he had a job to return to following his leave, especially given what they had told him before his leave that his job could be in jeopardy. In addition, Fetten also explicitly instructed the Plaintiff to only report part-time hours, even though he continued to carry the full-time load of his work responsibilities. Plaintiff's Complaint, ¶¶ 6-45.

During June 2020, Fetten and Mr. Michael Amthor ("Mr. Amthor") (of Defendant Ledvance's Human Resources department) then had a call with the Plaintiff to discuss what would happen after the Plaintiff ran out of leave/FMLA hours and to discuss the current COVID-19 prohibition of international air travel. During this discussion, Fetten blamed the Plaintiff for being stuck in Egypt and was extremely hostile and aggressive with him - so much so that Mr. Amthor called the Plaintiff immediately after the call ended to check in on him because he was surprised by Fetten's misconduct. Plaintiff's Complaint, ¶¶ 6-57.

Shortly after returning from his leave, the Plaintiff was unlawfully terminated. The reasons given by the Defendants for the Plaintiff's termination were false, inconsistent and manufactured. At the time of his termination, the Plaintiff was one of seven employees terminated in a purported

reduction in force, and to the best of his knowledge, the Plaintiff was the only PM who was involuntarily terminated after taking a leave. To include a PM in a reduction of force does not make sense for Ledvance. The PM role is a position for which there is always demand for, and employers like the Defendants often find it difficult to fill. In fact, the demand for PMs is so great that the Defendants started moving engineers and bringing back retired employees just to fill the need. Indeed, the Plaintiff was retained throughout two rounds of layoffs that occurred during 2019 because of this demand and because of his productivity. Additionally, these layoffs, and the 2020 layoff, primarily affected support functions like manufacturing, engineering and supply chain positions, rather than positions like the Plaintiff's. Plaintiff's Complaint, ¶¶ 6-57.

Indeed, the Defendants were rehiring for the Plaintiff's same position within a couple of months after terminating him. Moreover, they continue to have even a present need for that position as well based on a recent and second job posting for his PM position following his layoff. The other shifting reason the Defendants provide for the Plaintiff's inclusion in the layoff was his performance. However, no documentation supports any negative assessment of his performance. The Plaintiff excelled in his role and received favorable reviews for his performance from his colleagues and his superiors. Meanwhile, the Plaintiff was terminated and his female colleagues - who received a full 8 week and/or 12 week uninterrupted maternity leave - were not. Plaintiff's Complaint, ¶¶ 6-57.

On October 30, 2020, the Plaintiff filed a charge of discrimination ("the Charge") with the Massachusetts Commission Against Discrimination ("the MCAD"). The Plaintiff then subsequently withdrew that Charge and the MCAD issued him a right-to-sue letter in August, 2021. The Plaintiff then filed his discrimination claims, along with other common law claims, in the Massachusetts Superior Court for Middlesex County. The Defendants then removed the action

to this Court. On or about September 22, 2021, the Defendants filed a partial motion to dismiss most of the Plaintiff's claims. On August 17, 2022, this Court issued its Decision allowing the Defendants' motion in part and denying it in part.

## ARGUMENT

**I.    THE COURT'S DECISION ERRONEOUSLY AND IN *SUA SPONTE* FASHION DISMISSED ALL OF THE PLAINTIFF'S CLAIMS IN COUNTS I-IV WHEN THE DEFENDANTS HAD LIMITED THEIR DISMISSAL REQUEST TO ALLEGATIONS AND CONDUCT PRIOR TO JANUARY 4, 2020.**

In filing their partial motion to dismiss, the Defendants did not seek a wholesale dismissal of Counts I-IV, but rather sought to dismiss from those counts because they were time-barred "any events that occurred before January 4, 2020, including (i) the alleged statements attributed to Piper on November 14, 2019 and Mr. Fetten on November 19, 2019, respectively, (ii) Barlow's response to Eissa's email dated December 17, 2019; and (ii) the alleged discriminatory failure by LEDVANCE to grant Plaintiff a leave of absence under the MPLA (which he sought in November 2019 and began in December 2019). *See* Defs. Mtn. at 4-7. Instead of allowing the Defendants' motion limited to those specific events, the Decision, in *sua sponte* fashion, and without any prior notice to the Plaintiff, erroneously dismissed **all** of the Plaintiff's claims contained in Counts I-IV. *See* Dec. at 8-11. No basis, however, supports such a wholesale dismissal.

Indeed, the Decision dismissed the Plaintiff's claims that alleged discriminatory conduct that occurred **after** January 4, 2020, including the Plaintiff's alleged mistreatment during his leave after January 4, 2020 and his discriminatory termination from Defendant Ledvance, which occurred during July 2020. *See* Plaintiff's Complaint at ¶¶ 6-57. Such conduct is not time-barred and should not have been included in any dismissal order as it fell well within the 300-day period of his October 2020 MCAD Charge. *See Hall v. FMR Corp.*, 559 F. Supp. 2d 120 (D. Mass. 2008),

7

*citing* Mass. Gen. Laws ch. 151B, § 5 ("A state plaintiff must file an administrative charge with the MCAD "within 300 days of the occurrence of the alleged harassing or discriminatory event or events."); 804 CMR §1.04(3) (recognizing that a "complaint may be filed . . . at any time within three hundred days after the alleged unlawful conduct; provided, however, that the requirement shall not be a bar to filing in those instances where facts are alleged which indicate that the unlawful conduct complained of is of a continuing nature. . . .") .

Here, the Complaint sufficiently alleged conduct that occurred after January 4, 2020 and such allegations were timely filed on or about October 30, 2020. The Decision, therefore, to the extent that it dismisses the Plaintiff's claims in Count I-IV based on conduct occurring after January 4, 2020, should be reversed and such claims reinstated.

    **II.    REINSTATEMENT OF COUNTS I-IV IN THEIR ENTIRETY IS WARRANTED BECAUSE CORRECTLY APPLYING THE CONTINUING VIOLATION THEORY ESTABLISHES THAT ALL OF THE PLAINTIFF'S ALLEGATIONS ARE TIMELY AND VIABLE.**

The Decision dismissed Counts I-IV in their entirety after rejecting the Plaintiff's continuing violation theory, concluding that the Defendants' alleged denial of the Plaintiff's paternity leave was a "discrete act" outside of the limitations period. *See* Dec. at 8-11. This was error, as was the Decision's reliance on *DeNovellis v. Shalala*, 124 F.3d 298 (1st Cir. 1997) to buoy its dismissal efforts. Indeed, *DeNovellis* robustly supports the Plaintiff's application of the continuing violation doctrine. *Id*. at 309.

In *DeNovellis*, the court rejected the plaintiff's continuing violation theory at summary judgment because it concluded that there was insufficient evidence of a continuous chain of misconduct by the defendants. *Id.* at 309 (recognizing that the "continuing effects, without additional post-discriminatory actions do not turn a discrete pre-Act decision into a continuing violation"). In *DeNovellis*, the plaintiff, a long-time federal government employee alleged racial

discrimination claims extending over a period of time, including under two different supervisors, while the defendant argued that his claims were time-barred. *Id.* at 298-309. The plaintiff, however, conceded that discriminatory animus did not impact the defendant's employment decisions, and acknowledged that he experienced changes to his employment not because of such animus, but because of bureaucratic delays arising from a department reorganization. *Id.* at 309.

These *DeNovellis* facts, however, are not present here. In this case, the Plaintiff has alleged a continuing pattern of the Defendants' discriminatory conduct that has consistently persisted from the initial denial of his leave through the Defendants' hostile behavior during and after his leave, which included the Defendants' insistence that the Plaintiff work full-time hours with only part-time pay, insistence that he not accurately report his work hours, and abusive treatment from his supervisor, Fetten, inexplicably blaming him for being detained in Egypt despite COVID-19 protocols precluding his international travel at the time. Plaintiff's Complaint, ¶¶ 6-57. Indeed, the workplace hostilities endured and escalated to such a degree that it ultimately resulted in the Plaintiff's abrupt termination, despite his stellar work performance. *Id.* Such factual allegations contrast starkly with *DeNovellis* and illustrate a consistent thread of discriminatory and/or retaliatory behavior by the Defendants.

Indeed, in *DeNovellis,* the court held that "the focus on the inquiry in continuing violation cases should be on whether any *present violation* exists." *DeNovellis, supra* at 309 (emphasis added). Indeed, "[a] court evaluating a continuing violation argument must distinguish between a continuing violation and the continuing effects of a prior, yet discrete and no longer existent, discriminatory act." *Id.* Applying that focus here and drawing all reasonable inferences in favor of the Plaintiff leads inevitably to the conclusion that the Plaintiff's termination was not a "continuing effect" of the Defendants' prior denial of leave, but rather the capstone to an

interwoven, increasingly consistent course of discriminatory and/or retaliatory conduct by the Defendants over the time period of November 2019 through July 2020 – in a manner akin to a hostile work environment claim. *See Ruffino v. State St. Bank & Tr. Co.,* 908 F. Supp. 1019, 1038 (D. Mass. 1995) ("hostile environment discrimination typically is not confined to one act, directed at one individual one time; rather, it is a composite of workplace action and inaction"). Indeed, the apex – his July 2020 termination – more than qualifies as a "present violation" and was highlighted in his timely filed October 30, 2020 MCAD complaint.

The Defendants' denial of the Plaintiff's leave, and the court's recognition of it as a "discrete act," did not disqualify the Plaintiff from employing the continuing violation theory. A discrete act is an essential ingredient for accessing such a theory because, as the Massachusetts Supreme Judicial Court has recognized, "in certain discrimination cases arising under G.L. c. 151B, § 4, . . . the continuing violation doctrine permits plaintiffs to recover for damages occurring outside the limitations period as long as 'there is a discrete violation within the [statute of] limitations period to anchor the earlier claims." *Crocker v. Townsend Oil Co., Inc*., 464 Mass. 1, 11-12 (2012) (omitting internal quotations and citation). Indeed, the doctrine explicitly "recognizes that some claims of discrimination involve a series of related events that have to be viewed in their totality in order to assess adequately their discriminatory nature and impact." *Cuddyer v. Stop & Shop Supermarket Co.,* 434 Mass. 521, 531 (2001). Indeed, the Plaintiff's allegations of continuing discriminatory treatment during his 2020 leave and his July termination are discrete acts that can be substantively connected to the Defendants' denial of the Plaintiff's leave. *See* Plaintiff's Complaint, ¶¶ 6-57.

While the Decision correctly recognizes the continuous nature of this conduct as well as the Plaintiff's unlawful termination, it mistakenly applied the "continuing effects" doctrine, instead

of the "continuing violation" theory. *See* Dec. at 11 ("Although the effects of the purported violation may have persisted through the first half of 2020, and although the fact that Eissa took leave may even have precipitated a second, separate statutory violation, i.e. the allegedly retaliatory termination, neither fact is material here."). When viewed with all inferences drawn in the Plaintiff's favor, the Plaintiff's allegations establish that the Defendants' interference with the Plaintiff's leave was not "complete" – as the Decision mistakenly observes - with the Plaintiff's departure for leave in December 2020, but, as discussed *supra*, was recurring and continuous along a chain of misconduct that persisted over the course of his leave through his termination. *See* Plaintiff's Complaint, ¶¶ 6-57.

Had the court drawn such inferences in favor of the Plaintiff instead of the Defendants, the appropriate conclusion would have recognized that the Defendants' discriminatory violations persisted through the first half of 2020 and ultimately resulted in a second, separate statutory violation, the Plaintiff's retaliatory termination. Contrary to the Decision's perspective, such facts are indisputably material to the continuing violation theory and to the Plaintiff's claims in Counts I-IV. As this Court recognized in *Welch v. People's United Bank*, No. 20-11390, 2021 U.S. Dist. LEXIS 71974 (D. Mass. Apr. 13, 2021), the Plaintiff's allegations "are sufficient to survive a motion to dismiss" as "[d]iscovery will reveal" in further detail about the continuing course of the Defendants' discriminatory and/or retaliatory conduct. *Id.* at *19-20.

Moreover, unlike *DeNovellis*, which was decided at summary judgment on a full record, the parties here at the motion to dismiss stage have not yet explored all of the material facts surrounding these issues and accordingly, disposal of the Plaintiff's claims would be improper and premature. *See O'Rourke v. Hampshire Council of Governments*, No. CV 14-30216-MGM, 2015 WL 4719866, at *7 (D. Mass. Aug. 7, 2015) (denying employer's motion to dismiss breach of

11

contract claim, where plaintiff sufficiently alleged that his employer terminated him for a reason other than those outlined in the employee manual); *Beebe v. Williams College*, 430 F. Supp. 2d 18, 23 (D. Mass. 2006) (denying motion to dismiss employee's breach-of-contract claim, and noting that motion was "premature," where relevant factors pertaining to employee handbook had yet to be explored in discovery).

Amidst these disputed issues ripe for discovery is the question of when the Plaintiff became aware of the Defendants' discriminatory actions. Such a question cannot be answered at the motion to dismiss stage. The Decision itself recognized that the answer to this question is unclear, acknowledging that "[w]hile *it may not be clear* exactly when he became aware that he had been discriminated against, it was certainly no later than when he departed for Egypt in December, 2020, on a leave substantially dissimilar to what he requested and what he alleges the law affords him." Dec. at 10 (emphasis added). Yet, despite this recognition, the Decision seeks to answer this question itself – and does so improperly - without drawing all reasonable inferences *in the Plaintiff's favor* as is required under Rule 12 (b)(6) and arbitrarily concludes that the Plaintiff, a layperson, must have known of the Defendants' discriminatory conduct when he left for leave during December 2019. *Id.* at 10-11. A fair reading of the Plaintiff's Complaint does not support such a conclusion and violates Rule 12(b)(6). The Supreme Court does not require heightened fact pleading in employment discrimination cases; "a complaint need only allege enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 569-570 (2007), *citing Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 508, 512, 514 (2002). These errors,

therefore, warrant reversal of the Decision and reinstatement of the Plaintiff's claims in Counts I-IV.[1]

> **III.   THE DECISION ERRONEOUSLY CONCLUDED THAT THE PLAINTIFF'S ALLEGATIONS OF INTENTIONAL INTERFERENCE WITH CONTRACTUAL/ADVANTAGEOUS RELATIONS AGAINST DEFENDANTS PIPER AND BARLOW WERE INSUFFICIENT.**

Here, the allegations presented by the Plaintiff, if proven, would establish that Defendants Piper and Barlow's actions with respect to his paternity leave request and the subsequent adverse employment actions taken against him were based on discriminatory and/or retaliatory animus rather than on any intent or effort to serve his employer's interests, especially where he provided positive contributions to his employer as a high performer. *See O'Connell v. Chasdi*, 400 Mass. 686, 690 (1987) ("[w]here a fellow employee commits an intentional tort not related to the interests of the employer . . . the policies behind the act would not be served by immunizing the coemployee"). As the Plaintiff has sufficiently alleged discriminatory and/or retaliatory actions by these individual defendants, such allegations are sufficient to support his intentional interference with contractual relation claims against Defendants Piper and Barlow.

**A. <u>Piper</u>**

Once again, the Decision erroneously failed to draw all reasonable inferences in favor of the Plaintiff, as a court must do in reviewing a Rule 12(b)(6) motion. When considering a Rule 12(b)(6) motion to dismiss, the court accepts as true all well-pleaded facts and draws all reasonable inferences in plaintiff's favor. *Parker v. Hurley*, 514 F.3d 87, 90 (1st Cir. 2008). Instead here, the Decision draws inferences in favor of Piper and against the Plaintiff. The Decision, for instance, concludes that while Piper's "discouragement of plaintiff's stated intention to take the full period

---

[1] The Decision's reliance on *Campbell v. Mitre Corp.,* No. 98-11768-RWZ, 2001 U.S. Dist. LEXIS 13258, (D. Mass. June 1, 2001) is also misplaced as that decision involves distinguishable facts and did not involve a motion to dismiss, but a motion for summary judgment. *Id.* at *5-6.

of parental leave might reasonably be seen as related to gendered, discriminatory assumptions unrelated to a legitimate corporate interest", "[t] he link between those comments, made by a Human Resources representative without any apparent supervisory responsibility, and Eissa's termination is, however, too tenuous to support a plausible inference of liability and the claim will therefore be dismissed as to Piper." Dec. at 16 (omitting citation). This was erroneous.

With all reasonable inferences drawn in his favor, the Plaintiff's Complaint does indeed concretely connect Piper's actions to the Plaintiff's termination. The Complaint avers that she treated the Plaintiff differently with respect to his leave than she did female employees (who were all granted their full leave under her watch) and specifically threatened his job if he took his full leave. Indeed, when the Plaintiff *explicitly* questioned Piper about whether exercising his rights to take paternity leave would have adverse consequences on his employment, Piper responded that "[s]ome people might wonder if the company really needs an employee if the company subsists without the employee for such a long period of time." Plaintiff's Complaint, ¶¶ 6-14. And just shortly after his return from leave, Piper, who had a lead role in human resource and personnel matters, including employee hiring and termination, made good on her threat as the Plaintiff was abruptly terminated. *See id.* The causal connection is more than clear.

Moreover, such allegations reflect a continuing chain of discriminatory and malicious conduct from her initial actions towards the Plaintiff's leave requestthrough the Plaintiff's termination. It has long been established that "act[s] of unlawful discrimination can support an inference of actual malice" sufficient to sustain an intentional interference claim. *Chachon v. Brigham & Women's Hospital, et al*, 99 F. Supp. 3d 207, 219-220 (D. Mass. 2015) (omitting citation); *Comey v. Hill*, 387 Mass. 11, 19-20 (1982) (action based on age discrimination supported a jury verdict for the plaintiff on intentional interference claim). Here, it can also be reasonably inferred that Piper retaliated against the Plaintiff and terminated him because he took

his full leave, despite Piper's express instruction not to. Plaintiff's Complaint, ¶¶ 6-14. Such allegations of retaliatory conduct by an individual defendant also satisfies the "actual malice" requirement for interference claims. *See Zimmerman v. Direct Fed. Credit Union*, 262 F.3d 70 (1st Cir. 2001) (holding that retaliatory animus satisfies the "male" showing for intentional interference claims); *Caloia v. Putnam Invs.*, LLC, CIVIL ACTION NO. 11-10073-RWZ, 8 (D. Mass. Aug. 21, 2012) ("However, "the elements underlying a claim for unlawful retaliation may be used to show malice when a tortious interference claim is brought against a supervisor in a loss-of-employment case."). Accordingly, it was error to dismiss the intentional interference claims against Piper.

Further, any conclusion that Piper lacked supervisory authority runs contrary to the Plaintiff's allegations in his Complaint. First, the Plaintiff's allegations establish that Piper was a lead Human Resources representative and therefore oversaw personnel matters with supervisory authority. Second, the allegations establish that Piper exercised such personnel authority, even with respect to employee terminations, as she stated to the Plaintiff that his employment could be terminated should he exercise his rights to a full leave. Third, the Plaintiff was indeed terminated following his leave, just as she predicted. Plaintiff's Complaint, ¶¶ 6-14. Such allegations, with all reasonable inferences drawn in his favor, establish clearly her supervisory authority and her power to hire and fire. *See id.* For all of these reasons, the Plaintiff's interference claim against Piper should be reinstated.

### B. Barlow

In similar fashion, the intentional interference claim against Barlow should be reinstated. Indeed, the Decision mistakenly states that the Plaintiff's allegations do not reflect Barlow's malice. Dec. at 16. However, to the extent that the Plaintiff's allegations in his Complaint against Barlow reflect Barlow's discriminatory intent and actions, such allegations are sufficient to sustain

15

the Plaintiff's interference claim. *See Chachon, supra* at 219-220 ("act[s] of unlawful discrimination can support an inference of actual malice" sufficient to sustain an intentional interference claim). Indeed, such failures to act, failures to investigate and failures to protect the Plaintiff from discrimination give rise to individual liability under the discrimination statutes. *See Semmami, supra*; s*ee also Chapin, supra at* 80; *see also Jorge v. Silver City Dodge*, 15 MDLR 1518, 1531 (1993), *quoting Munford v. James T. Barnes Co.*, 441 F. Supp. 459, 466 (E.D. Mich. 1977) ("`[f]ailure to investigate gives tacit support to the discrimination because the absence of sanctions encourages abusive behavior.' "); *Przybycien v. Aid Maintenance Co.,* 13 MDLR 1266, 1283 (1991) (same). With viable allegations of discrimination established against Barlow, the Plaintiff has alleged malice against him sufficient to sustain his intentional interference claim. See *Chachon, supra at* 219-220 (omitting citation).

Additionally, reversal is warranted because the Decision mistakenly construes the Plaintiff's allegations against Barlow as limited to the Plaintiff's contention that Barlow failed to investigate and remediate the Plaintiff's claims. The Complaint's allegations, however, extend beyond those contentions and also claim that Barlow participated in the Plaintiff's discriminatory and/or retaliatory termination after the Plaintiff took his paternity leave. As the Complaint makes clear, Barlow, as the Vice President of Defendant Ledvance's Human Resources Department, was charged with overseeing all personnel matters, including employee terminations and/or layoffs – including the Plaintiff's. Such participation - and even an acquiescence - to a retaliatory termination of an employee, gives rise to individual liability under the discrimination statutes because "[a] deaf ear from management may contribute to and encourage the hostility of the workplace, creating an impression that employees may engage in . . . harassment or discrimination with impunity." *Chapin v. Univ. of Mass. at Lowell*, 977 F. Supp. 72, 80 (D. Mass. 1997); *see also*

16

*Hope v. San Ran, Inc.*, 8 MDLR 1195, 1211 (1986). Accordingly, dismissal of the claim against Barlow should be reversed.

Beyond that, dismissal was inappropriate at this stage because "any judgment as to [Plaintiff]'s ability to prove any set of facts demonstrating that [the individual defendants] w[ere] acting neither within the course of [their] employment nor in furtherance of [their] employer's interest" would appear to be "premature." *Foley v. Proctor Gamble Distributing Company*, C.A. 01-11314-RWZ, 2003 WL 21696544, at *4 (D. Mass. Jul. 21, 2003) (omitting citation). Accordingly, reversal of the Decision on these claims is required.

### IV.   THE DECISION ALSO ERRONEOUSLY CONCLUDED THAT THE PLAINTIFFS' FMLA CLAIM AGAINST DEFENDANT BARLOW IS LEGALLY INSUFFICIENT.

In pursuing their partial motion to dismiss Count V based on the Family Medical Leave Act ("FMLA") against Barlow, the Defendants argued that the Plaintiff's allegations were insufficient because he "does not allege any wrongful conduct by Barlow that violates the FMLA and for which Plaintiff can recover. " Defs. Mtn. at 10.  The Defendants, however, did not seek dismissal of the claim because Barlow was not an "employer" within the meaning of the FMLA statute. *Id.*  Indeed, the Plaintiff had no opportunity to address this issue substantively in his filings because the Defendants had not raised it as an issue in their motion and therefore had no prior notice of this issue as a basis for dismissal. *Id.* The Decision presented the Plaintiff's first opportunity to do so.

Nonetheless, the Plaintiff's Complaint more than sufficiently alleged that Barlow was an employer under the requisite test.  That test asks whether the supervisor, here Barlow, "exercised sufficient control over the employee" to constitute an "employer" for the purposes of the statute. *Limoli v. Delta Air Lines, Inc.*, No. 18-10561-FDS, 2019 U.S. Dist. LEXIS 203125, at *14 (D.

Mass. Nov. 22, 2019)(omitting citations). In satisfying this test, a court typically looks to whether the defendant:

> (1) had the power to hire and fire the employees;
> (2) supervised and controlled employee work schedules or conditions of employment;
> (3) determined the rate and method of payment;
> (4) maintained employment records and
> (5) had personal responsibility for making decisions that contributed to the alleged violation.

*Id.* (internal punctuation omitted). "The second and fifth factors carry the most weight." Decision at 13 (omitting citation).

Here, the Plaintiff has alleged that Barlow was the employer's lead human resources official who oversaw all human resource issues. *See* Plaintiff's Complaint at ¶ 19. He has also alleged, *see supra*, that Barlow had personal responsibility for making decisions that contributed to the violations, as the Plaintiff reached out to him for assistance regarding his leave request and complications, including Piper's and Fetten's misconduct, and also alleged that Barlow failed to take any remedial action. *See* Plaintiff's Complaint at ¶¶19-25. It logically follows from such allegations, that Barlow had the authority to take such personnel actions, including but not limited to managing employee leaves, responding to employee complaints, and participating in employee terminations. *Id.* Barlow's overarching personnel power as the lead human resource official also included a supervisory role with respect to employee schedules and/or conditions of employment. *See id.* With all reasonable inferences drawn in the Plaintiff's favor, combined with the court's common sense review of the Plaintiff's Complaint, the Plaintiff has adequately alleged that Barlow was an "employer" within the meaning of the FMLA. Accordingly, reinstatement of such claim is required.[2]

---

[2] Should the Court conclude otherwise, the Plaintiff requests leave to amend his Complaint accordingly.

**V.  THE DECISION FAILED TO PROPERLY REVIEW THE PLAINTIFF'S BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING CLAIM.**

Under Massachusetts law, a covenant of good faith and fair dealing is implied in every contract. *UNO Restaurants, Inc. v. Boston Kenmore Realty Corp.,* 441 Mass. 376, 385 (2004). With such an obligation, "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Druker v. Roland Wm. Jutras Assocs.,* 370 Mass. 383, 385 (1976), *quoting from Uproar Co. v. National Bdcst. Co.*, 81 F.2d 373, 377 (1st Cir. 1935), *cert. denied*, 298 U.S. 670 (1936). The shape of the implied covenant of good faith and fair dealing necessarily depends upon the terms of the contract. *See, e.g., Hawthorne's, Inc. v. Warrenton Realty, Inc.*, 414 Mass. 200, 210-211 (1993). "[R]ecovery under [a breach of the implied covenant of good faith and fair dealing] requires conduct taken in bad faith either to deprive a party of the fruits of labor already substantially earned or unfair leveraging of the contract terms to secure [an] undue economic advantage." *Christensen v. Kingston School Committee*, 360 F. Supp. 2d 212, 226 (D. Mass. 2005). Here, the Plaintiff has more than adequately alleged such bad faith conduct.

Drawing all reasonable inferences in the Plaintiff's favor, the Complaint establishes that the Defendants, with bad faith exercised by their discriminatory and/or retaliatory animus, unlawfully denied the Plaintiff the fruits of his employment contract. Indeed, the Defendants unfairly leveraged the contract terms to secure an unfair economic advantage over the Plaintiff. See *Christensen, supra* at 226. A fair reading of the Plaintiff's Complaint establishes that the Plaintiff was treated disparately from his female colleagues. He was deprived of his full paternity leave benefit and exploited to work full-time hours with only part-time pay as well as denied bonus monies to which he was entitled to receive. He was also subjected to unfair and hostile treatment

by his supervisors. And despite stellar work performance, he was abruptly terminated shortly after returning from his leave. Plaintiff's Complaint, ¶¶ 6-56. Such allegations more than adequately give rise to a viable claim.

Accordingly, reinstatement of the Plaintiff's claim is warranted.

## VI.    CONCLUSION

Based on the foregoing and any other matters stated orally to the Court, the Plaintiff respectfully requests that this Court allow the Plaintiff's Motion.

**DATED: September 14, 2022**               Respectfully submitted,

                                            AHMED EISSA

                                            By his Attorney,

                                               /s/    Helen G. Litsas
                                            _____
                                            Helen Litsas (BBO #644848)
                                            LAW OFFICE OF HELEN G. LITSAS
                                            22 Mill Street, Suite 408
                                            Arlington, MA 02476
                                            Phone: (617) 596-5561
                                            helen@litsaslaw.com


## CERTIFICATE OF SERVICE

I hereby certify that on September 14, 2022, a copy of the foregoing document was filed electronically through the Court's ECF system on the following counsel for Defendants:

Stéphanie Smith, Esq.
Casner & Edwards, LLP
303 Congress Street
Boston, Massachusetts 02210


                                               /s/    Helen G. Litsas
                                            _____
                                               Helen G. Litsas