IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF
MASSACHUSETTS

| | |
|---|---|
| AHMED EISSA, ) | |
| Plaintiff ) | |
| ) | |
| ) | |
| v. ) | Case No.: 1:21-cv-11515 |
| ) | |
| ) | |
| ) | |
| ) | |
| LEDVANCE LLC, KARSTEN FETTEN, ) | |
| MARCI PIPER and ALAN BARLOW, ) | |
| Defendants ) | |
| ) | |

## FIRST AMENDED COMPLAINT

The Plaintiff, AHMED EISSA ("Plaintiff" or "Mr. Eissa"), sets forth below his Complaint based on the discriminatory and unlawful conduct of the Defendants, LEDVANCE LLC ("Defendant LEDVANCE"), Defendant KARSTEN FETTEN ("Defendant Fetten"), Defendant ALAN BARLOW ("Defendant Barlow"), and Defendant MARCI PIPER ("Defendant Piper"). Instead of celebrating the joy of his newborn child with a paternity leave from his employment, Mr. Eissa was subjected to discriminatory and retaliatory actions by the Defendants, his former employer and his former supervisors, for making and exercising his paternity leave request. In doing so, the Defendants violated not only G.L. c. 151B, but also, Title VII, the Family Medical Leave Act ("FMLA"), and the Massachusetts Parental Leave Act ("MPLA") and their conduct also gives rise to viable claims of intentional interference with advantageous relations, intentional infliction of emotional distress and the breach of the implied covenant of good faith and fair dealing.

## THE PARTIES

1.    The Plaintiff, AHMED EISSA ("Plaintiff" or "Mr. Eissa"), is an individual residing at 285 3rd St Apt. 242, Cambridge, MA  02142.

2.    The Defendant, LEDVANCE LLC ("Defendant Ledvance" or "the company"), is a Massachusetts corporation doing business in the Commonwealth of Massachusetts at 200 Ballardvale Street, Wilmington, Massachusetts.

3.    The Defendant, KARSTEN FETTEN ("Defendant Fetten"), resides at 3 Parsons Road, West Newbury, MA 01985, and at all times, was employed by Defendant Ledvance as Mr. Eissa's supervisor.

Case 1:21-cv-11515-NMG   Document 58-1   Filed 06/30/23   Page 2 of 15

4.	The Defendant, MARCI PIPER ("Defendant Piper"), resides at 179 Highland Street, South Hamilton, MA, 01936,  and at all times, was employed by Defendant Ledvance as the Human Resources Manager.

5.	The Defendant, ALAN BARLOW ("Defendant Barlow") resides at 200 Ballardvale Street, Wilmington, Massachusetts.  , and at all times, was employed by Defendant Ledvance as Vice President of Human Resources.

## FACTS AND CIRCUMSTANCES

6.	The Plaintiff refers to the allegations of Paragraphs 1 through 5 and by such reference repleads and incorporates them as though fully set forth here.

7.	The Plaintiff is a Middle-Eastern male and a native of Egypt who was hired on August 30, 2018, as a Product Manager for Defendant Ledvance. Strikingly, Defendant Ledvance's own personnel forms did not permit Mr. Eissa to identify himself as Middle-Eastern.

8.	For almost two years, Mr. Eissa worked as a dedicated and successful Product Manager for the Defendant, Ledvance LLC, a company that sells general lighting for lighting professionals as well as end users.

9.	On August 7, 2020, just after the birth of his first child and after returning from his paternity leave, Defendant Ledvance terminated Mr. Eissa, a loyal and stellar employee who successfully managed one of the company's largest portfolios and had surpassed the performance of his peers.

10.	In fact,  a review of his personnel file reveals no performance or other disciplinary issues. Rather, he earned rave reviews for his performance, initiative and camaraderie from his colleagues.  For example, one Ledvance colleague, and his first supervisor at the company, Mr. Omar Rivera, stated:

> "*Ahmed reported to me directly and is an asset to the team and LEDVANCE. His product launch ratio compared to others excelled. He was more than willing to take on additional task and special projects. Where he excelled in deep set analysis. Ahmed is a very talented product manager and capable to taken on other roles. I would love to have him on my team again.*"

Another colleague, named Ms. Diane Landry, described Mr. Eissa as follows:

> "*I worked for over a year with Ahmed at Ledvance as the Project Manager for his product launches. Ahmed is an outstanding Product Manager with deep knowledge of the Luminaire industry. His rational and business experience allowed him to successfully build the business case for each of his projects. What separated him to his colleagues was his willingness to work with me so I could properly help managed [sic]his projects allowing him to focus on his portfolio and launches. His product launches ratio was outstanding compared to others. No matter what the situation was Ahmed always stayed calm which made it very pleasant to work with him. I will truly miss him.*"

2

11.   The terms and conditions of Mr. Eissa's employment, however, changed drastically in November 2019 when, after the October 2019 birth of his child, he sought to take advantage of the company's twelve (12) week family/paternity leave benefit.

12.   While Defendant Ledvance's Human Resources representative, Defendant Piper, acknowledged that Mr. Eissa was entitled to twelve weeks of family leave under the company policy, she expressly discouraged Mr. Eissa from utilizing this benefit and discouraged him from being away from the company for that requested length of time. She also informed him that the company did not specifically have a paternity leave policy.

13.   No other male employee had previously taken a full twelve week paternity leave with Defendant Ledvance. When Mr. Eissa requested examples of prior employees accommodating the company's needs, Defendant Piper responded that there was "not much precedence" for male employees taking time off. Meanwhile, the Defendants have, upon information and belief, previously provided female employees with a full eight week, twelve week and/or otherwise uninterrupted maternity leave.

14.   Given the tenor of his discussion with Defendant Piper, Mr. Eissa grew concerned and then bluntly asked Defendant Piper whether exercising his rights to take paternity leave would have adverse consequences on his employment. In response, Defendant Piper obliquely responded that, "Some people might wonder if the company really needs an employee if the company subsists without the employee for such a long period of time."

15.   When Mr. Eissa had discussed his request for a full paternity leave with his supervisor, Defendant Fetten, on November 19, 2019, Mr. Eissa had explained to him that he, his wife and newborn child were planning to travel to Egypt during his leave so that they could access care and support from their extended family who reside overseas. Mr. Eissa also stated that he planned to return to work immediately after his twelve week leave of absence.

16.   In response, Defendant Fetten did not approve of Mr. Eissa's request for a full, uninterrupted twelve week paternity leave, but instead explored a part-time work option Defendant Piper had proposed where Mr. Eissa's leave would include a 20-hour per week work arrangement.

17.   Mr. Eissa agreed to consider such a proposal as he was concerned that he would be terminated if he refused to do so. At no point did Mr. Eissa ask to work during his leave. Mr. Eissa showed willingness to work during his leave, but only after he was instructed to do so. Mr. Eissa was concerned about his employment status, especially given his prior unsettling discussions with Defendants Piper and Fetten.

18.   During December 2019 and to keep the lines of communication open, Mr. Eissa had inquired several times on the status of his leave request and was told by Defendant Fetten that it was still being worked on. After these attempts, Mr. Eissa subsequently shared with Defendant Fetten that he had purchased tickets to Egypt. Defendant Fetten asked for the exact travel dates and Mr. Eissa responded with the precise travel dates. Defendant Fetten stated that the company was still considering a part-time remote work arrangement and then threatened that Mr. Eissa's decision to book airfare "may have consequences" and that a "decision will have to be made" by the company. At the end of the conversation, Defendant Fetten made a reference to Mr. Eissa's former supervisor, Mr. Omar Rivera, who was separated from the

company after requesting a remote working arrangement. Such a reference made Mr. Eissa feel that his job was in jeopardy.

19. On or about December 17, 2019, Mr. Eissa, deeply affected by such comments, then emailed and informed Defendant Barlow, the Vice President of Human Resources for Defendant Ledvance and the individual overseeing all human resource and leave issues at Respondent Ledvance, about his unsettling communications with Defendants Fetten and Piper. regarding his leave request.

20. Despite these reports and his detailed communication with Defendant Barlow, Mr. Eissa's concerns were not ameliorated by Defendant Barlow or Defendant Ledvance, but they were increased.

21. Indeed, Defendant Barlow did not deny anything about Mr. Eissa's communications with Defendants Piper and Fetten nor did he take any remedial action concerning Defendants Piper or Fetten's actions.

22. Also, at no point did Defendant Barlow inform Mr. Eissa that he was not required to work during his leave nor was he told by Defendant Barlow that Defendant Piper's and Fetten's conduct, including but not limited to discouraging his full use of a twelve week paternity leave, was not only inappropriate but unlawful.

23. Mr. Eissa had specifically asked for a full, uninterrupted  paternity leave, a leave he was lawfully entitled to, and all his emails exchanged with the Defendants Piper and Barlow confirm his request and intentions.  It was not – and never - a part-time work arrangement that translated into a request for intermittent leave. Mr. Eissa sought a full leave opportunity so that he could truly experience the birth of his first child without the interruption of his demanding and time-consuming work obligations.

24. Mr. Eissa's request for full leave was made from the beginning of his discussions with Defendant Ledvance, as his email to Respondent Barlow and all his previous communications with Human Resources clearly illustrate. Indeed, during their contemporaneous email exchanges and verbal discussions about this request, the Defendants never denied any of Mr. Eissa's representations about his leave request nor how he had described the Defendants' responses to this leave request.

25. Defendant Fetten then informed Mr. Eissa that the company was going to approve  an intermittent leave request,  and Mr. Eissa would be expected to work remotely from Egypt on a part-time basis.  Defendant Fetten indicated that Mr. Eissa would be assigned to a "support role" and another employee would manage his portfolio.  Mr. Eissa's wages would also be reduced by 50% percent.

26. Left with no other feasible option, Mr. Eissa acquiesced to the Defendants' proposal, a proposal that interfered with his ability to take a full leave for the birth of his child. Mr. Eissa, however, did not want to do anything that would jeopardize his job.

27. Indeed, the remote work option was a substantial compromise on Mr. Eissa's part. His intent and plan was always to take an uninterrupted paternity leave, especially as this was for the birth of his first child. Defendant Piper, however, explicitly discouraged him from doing so and directed him instead to find an accommodation that worked not for him, but for the company and his manager.

28.     During his leave, Mr. Eissa successfully performed his duties while working remotely from Egypt. To compensate for the different time zones, he would typically start his work day at 2:00 p.m., but he was always willing to work any hours to accommodate the needs of the company.  As a result of the COVID-19 pandemic, the company's entire US-based sales team worked remotely during the spring and summer of 2020.

29.     The six-hour time difference between Egypt and the United States did not interfere in any way with Mr. Eissa's ability to complete his work because it actually made Mr. Eissa available earlier for his employer's China team and later for the US team.

30.     Contrary to Defendant Fetten's representation, Mr. Eissa did not take on a support role, but continued to primarily (and successfully) manage his $35 million dollar portfolio full-time. Despite this, the Defendants continued to pay Mr. Eissa a 50% reduced salary from his full-time wages. Defendant Fetten never checked in or followed up on his performance during Mr. Eissa's remote work arrangement in Egypt.

31.     Mr. Eissa also did not say anything at the time to the Defendants because he was understandably concerned about losing his job and he was willing to do whatever he could to make sure he had a job to return to following his leave, especially given that the Defendants had told him before his leave that his job could be in jeopardy. In addition, Defendant Fetten had also explicitly instructed Mr. Eissa to only report part-time hours, even though he continued to carry the full-time load of his work responsibilities.

32.     Mr. Eissa worked in dedicated fashion and continued to excel in his role. In fact, after the quality control department green-lighted a backlit panel product, it was Mr. Eissa who discovered that the wiring was wrong for emergency mode operation, a feature required by code. This was a critical contribution because had Mr. Eissa not discovered this defect, it would have resulted in product returns and significant revenue losses to the company. However, the Defendants hardly acknowledged Mr. Eissa's contribution and his resolution of a problem that should have been resolved by another department.  Meanwhile, other employees have been recognized and highlighted for even lesser contributions.

33.     In addition, Mr. Eissa, while working remotely, also salvaged a $400,000.00 controls sales opportunity by proposing a feasible technical solution to remedy the problem after the controls team had failed to propose a solution.

34.     In early March 2020, Defendant Fetten asked Mr. Eissa to cut his leave short even further by returning from Egypt to the United States early so that he could participate in a quarterly sales meeting held during the end of March.

35.     Once again, accommodating the Defendants' request, Mr. Eissa agreed to leave early from Egypt and leave his family behind. He, however, also requested assurances from the Defendants that he would be reimbursed for the additional financial costs incurred as a result of his early return.

36.     Defendants rejected this request and indicated that Mr. Eissa would have to cover these financial costs himself, an $800.00 airline fee to change the departure date. Subsequently, Mr. Eissa observed that Defendant Fetten was hostile towards Mr. Eissa for even making such a request

37.    When the COVID-19 pandemic then hit during the middle of March 2020, Mr. Eissa's return flight from Egypt was canceled and upon learning this information, he immediately informed Defendant Fetten via email explaining the situation and asking him for his direction.

38.    Mr. Eissa also told him he could reschedule a return flight for the United States, despite all the medical advice that he had received against doing that. Mr. Eissa also explained that he could continue working from Egypt until things improved.

39.    In response, Defendant Fetten directed Mr. Eissa to "stay put" in Egypt. Shortly thereafter, Egypt suspended all international travel and Mr. Eissa was then prohibited from returning to the United States ("US").

40.    Due to the global pandemic and COVID-19 travel restrictions, Defendant Ledvance's quarterly meeting was also cancelled by the Defendants.

41.    During June 2020, Defendant Fetten and Mr. Michael Amthor ("Mr. Amthor"), a representative from Defendant Ledvance's Human Resources department, then had a call with Mr. Eissa to discuss the current prohibition of international air travel.

42.    During this discussion, Defendant Fetten cast inappropriate blame upon Mr. Eissa for being stuck in Egypt and was extremely aggressive with him. So much so that Mr. Amthor called Mr. Eissa immediately after this call ended to check in on him. Mr. Amthor expressed surprise that Defendant Fetten was so aggressive towards Mr. Eissa.

43.    Due to the pandemic, Mr. Eissa continued to work remotely until he was finally able to secure transportation back to the US on July 24, 2020.

44.    Upon his return to the US, Mr. Eissa continued to work remotely and underwent a two-week quarantine before returning to the office in person.

45.    Without any warning, discipline or other legitimate basis, the Defendants abruptly terminated Mr. Eissa - even before his two-week quarantine had expired. Such action violated Defendant Ledvance's own FMLA policy, which provided the following:

> "Upon returning from FMLA leave that has not exceeded 12 weeks or 26 weeks in the case of injured service member leave or injured service member leave combined with leave for any other purpose under the FMLA, the employee will be returned to the same position that he or she left when the leave began, or to an equivalent position with equivalent pay, benefits and other terms and conditions of employment, in accordance with the conditions provided for such reinstatement under the FMLA. The employee will be reinstated without loss of employment rights or benefits that he or she earned accrued prior to the beginning of the leave, except to the extent such benefits were used or paid during the leave."

46.    Contrary to its own policy, Defendant Ledvance did not reinstate Mr. Eissa to the same position with the same benefits he had prior to his leave. Instead, with his abrupt and retaliatory termination within taking days of Mr. Eissa's return from leave, Defendant Ledvance removed Mr. Eissa from his employment entirely.

47.    During this time, the Defendants also announced that US-based employees could continue to work remotely until September 8, 2020.

6

48.     At the time of his termination, Mr. Eissa was the only employee from his Product Management team that was terminated from the company. Employees with less experience, less talent and less contributions than Mr. Eissa, however, were retained. Despite Mr. Eissa serving as one of the strongest performers on his team, he was the one targeted for termination.

49.     The reasons given by the Defendants for Mr. Eissa's termination have been inconsistent and are a pretext for discrimination and/or retaliation for his paternity leave request. The Defendants have provided no information detailing any objective criteria used to select the employees for the purported layoff nor have the Defendants identified the employees involved in these layoff decisions. Indeed, female employees at Defendant Ledvance who had been provided with a full eight and/or twelve week uninterrupted maternity leave were not included in Defendant Ledvance's layoff.

50.     At the time of his termination, Mr. Eissa was one of seven employees terminated in a purported reduction in force, and to the best of his knowledge, Mr. Eissa was the only PM who was involuntarily terminated after taking a leave. Moreover, the PMs who were retained were Caucasian and had not previously taken a paternity or FMLA-related leave.

51.     To include a PM in a reduction of force does not make sense for Defendant Ledvance because the PM role is a position for which there is always demand for, and employers like the Defendants often find it difficult to fill.

52.     In fact, the demand for PMs is so great that the Defendants started moving engineers and bringing back retired employees just to fill the need. Indeed, Mr. Eissa was retained throughout two rounds of layoffs that occurred during 2019 because of this demand and because of his successful productivity.

53.     Additionally, these layoffs and the 2020 layoff, primarily affected support functions like manufacturing, engineering and supply chain positions, rather than positions like Mr. Eissa's.

54.     Indeed, within a couple of months of Mr. Eissa's termination, the Defendants sought to hire for his PM role.

55.     That hiring need has also continued presently as the Defendants have once again recently placed a second job posting seeking to fill Mr. Eissa's PM position. Indeed, they had also hired a PM back who had previously resigned.

56.     Mr. Eissa was not the most junior employee as Defendants suggest because many PMs were laterally moved from other departments. If seniority was truly considered as part of the reduction in force, Mr. Eissa was not the most junior employee. There were other PMs who were retained by the Defendants who were junior to Mr. Eissa.

57.     The other shifting reason the Defendants provide for Mr. Eissa's inclusion in the layoff was his performance. However, there is no documentation provided by the Defendants to support this claim. That is because none exists. Mr. Eissa excelled in his role and received favorable reviews for his performance from his colleagues and his superiors. He received no disciplinary action, reprimand or other negative performance review during his tenure with Defendant Ledvance.

7

58.     A copy of Mr. Eissa's personnel file and performance reviews only reinforces this conclusion because it contains no such disciplinary action nor any negative performance reviews.  To claim that Mr. Eissa's s termination was based on his performance and experience as the Defendants allege is false, especially considering the fact that at the time of his termination, Mr. Eissa was managing one of the largest portfolios for Defendant Ledvance without any complaints and with stellar results. There is no other conclusion to be made other than biased, discriminatory and retaliatory motives infected Defendant Ledvance's decision to terminate Mr. Eissa.

## COUNT ONE

### G.L. 151B and Title VII (GENDER DISCRIMINATION)

#### Plaintiff v. Defendant Ledvance

59.     The Plaintiff refers to the allegations of Paragraphs 1 through 58, and by such reference repleads and incorporates them as though fully set forth here.

60.     The conduct of Defendant Ledvance, as set forth above, discriminated against the Plaintiff on the basis of gender in violation of G.L. 151B and Title VII.

61.     Said conduct of Defendant also constitutes a violation of public policy. According to the EEOC, "[w]hen an employer does grant maternity leave, the employer may not deny paternity leave to a male employee for similar purposes, e.g., preparing for or participating in the birth of his child or caring for the newborn. Accommodating female but not male employees constitutes unlawful disparate treatment of males on the basis of sex." EEOC Compliance Manual, Section 626.6 on Paternity Leave

62.     As a proximate result of Defendant's conduct, the Plaintiff has suffered and continues to suffer substantial losses in earning, job experience, retirement benefits, and other employee benefits that he would have received absent Defendant's discrimination.

63.     Furthermore, the Plaintiff has incurred additional costs and expenses due to the Defendant's discrimination.

64.     As a further proximate result of the above-mentioned acts, the Plaintiff has suffered humiliation, mental pain and anguish, all to the Plaintiff's damage.

65.     The above-mentioned acts of Defendant were willful, wanton, malicious, and oppressive, and justify the awarding of exemplary and punitive damages.

## COUNT TWO

### G.L. 105, § 105D (MASSACHUSETTS PARENTAL LEAVE ACT)  ("MPLA")
#### Plaintiff v. Defendant Ledvance

66.     The Plaintiff refers to the allegations of Paragraphs 1 through 65, and by such reference repleads and incorporates them as though fully set forth here.

67.     The conduct of Defendant, as set forth above, constitutes a violation of the Massachusetts Parental Leave Act ("MPLA").

68.     Here, Mr. Eissa met the eligibility requirements for leave under the MPLA and he was entitled to eight weeks of unpaid leave in their entirety under the MPLA. Indeed, the MPLA Guidelines provide that "An employer cannot refuse to grant MPLA leave on the grounds that doing so would constitute a hardship."

69.     Similarly, an employer may not treat an employee returning from leave less favorably than it treats other employees seeking to return to work after comparable absences for non-child birth reasons.

70.     As a proximate result of Defendant's conduct, the Plaintiff has suffered and continues to suffer substantial losses in earning, job experience, retirement benefits, and other employee benefits that he would have received absent Defendant's discrimination. Furthermore, the Plaintiff has incurred additional costs and expenses due to the Defendant's discrimination.

71.     As a further proximate result of the above-mentioned acts, the Plaintiff has suffered humiliation, mental pain and anguish, all to the Plaintiff's damage.

72.     The above-mentioned acts of Defendant were willful, wanton, malicious, and oppressive, and justify the awarding of exemplary and punitive damages.

## COUNT THREE

### G.L. 151B and Title VII (Ethnic/National Origin Discrimination)

### Plaintiff v. Defendant Ledvance

73.     The Plaintiff refers to the allegations of Paragraphs 1 through 72, and by such reference repleads and incorporates them as though fully set forth here.

74.     The conduct of Defendant, as set forth above, constitutes unlawful discrimination against the Plaintiff on the basis of ethnicity/national origin, in violation of G.L. 151B and Title VII.

75.     Said conduct of Defendant constitutes a violation of public policy.

76.     As a proximate result of Defendant's conduct, the Plaintiff has suffered and continues suffer substantial losses in earning, job experience, retirement benefit, and other employee benefits that he would have received absent Defendant's discrimination. Furthermore, the Plaintiff has incurred additional costs and expenses due to the Defendant's discrimination.

77.     As a further proximate result of the above-mentioned acts, the Plaintiff has suffered humiliation, mental pain and anguish, all to the Plaintiff's damage.

78.     The above-mentioned acts of Defendant were willful, wanton, malicious, and oppressive, and justify the awarding of exemplary and punitive damages.

## COUNT FOUR

### G.L. 151B and Title VII (Aiding and Abetting & INTERFERENCE)

### Plaintiff v. Defendants Fetten, Barlow and Piper

79.     The Plaintiff refers to the allegations of Paragraphs 1 through 78 and by
        such reference repleads and incorporates them as though fully set forth here.

80.     The conduct of Defendants, as set forth above, constitutes unlawful interference
        and/or aiding and abetting discrimination against the Plaintiff on the basis of gender
        and/or ethnic/national origin, in violation of G.L. 15 1B and Title VII.

81.      Said conduct of Defendants constitutes a violation of public policy

82.     As a proximate result of Defendants' conduct, the Plaintiff has suffered and continues to
        suffer substantial losses in earning, job experience, retirement benefits, and other
        employee benefits that he would have received absent Defendants'
        discrimination. Furthermore, the Plaintiff has incurred additional costs and
        expenses due to the Defendants' discrimination.

83.      As a further proximate result of the above-mentioned acts, the Plaintiff has
        suffered humiliation, mental pain and anguish, all to the Plaintiff's damage.

84.     The above-mentioned acts of Defendants were willful, wanton, malicious, and
        oppressive, and justify the awarding of exemplary and punitive damages.

## COUNT FIVE

### Willful Violation of the Family Medical Leave Act ("FMLA")

### Plaintiff v. Defendants Ledvance, Piper, Barlow and Fetten

85.     The Plaintiff refers to the allegations of Paragraphs 1 through 84, and by
        such reference repleads and incorporates them as though fully set forth here

86.     The conduct of Defendants, as set forth above and including but not limited to the
        denial of the Plaintiff's leave request and interference with his leave
        request, constitutes a violation of the Family Medical Leave Act
        ("FMLA").

87.     Said conduct of Defendants constitutes a violation of public policy.

88.     As a proximate result of Defendants' conduct, the Plaintiff has suffered and
        continues to suffer substantial losses in earning, job experience, retirement benefits,
        and other employee benefits that he would have received absent Defendants'
        violation.

89.     As a further proximate result of the above-mentioned acts, the Plaintiff has
        suffered humiliation, mental pain and anguish, all to the Plaintiff's damage.

90.     The above-mentioned acts of Defendants were willful, wanton, malicious, and
        oppressive, and justify the awarding of exemplary and punitive damages.

## COUNT SIX

### Willful Violation of the Family Medical Leave Act ("FMLA") - Retaliation

### <u>Plaintiff v. Defendants Ledvance, Piper and Fetten</u>

91.     The Plaintiff refers to the allegations of Paragraphs 1 through 90, and by such reference repleads and incorporates them as though fully set forth here.

92.     The conduct of Defendants, as set forth above and including but not limited to the adverse employment actions and unjustified termination of the Plaintiff immediately upon his return from leave, constitutes a violation of the Family Medical Leave Act (FMLA).

93.     Said conduct of Defendants constitutes a violation of public policy.

94.     As a proximate result of Defendants' conduct, the Plaintiff has suffered and continues to suffer substantial losses in earning, job experience, retirement benefits, and other employee benefits that he would have received absent Defendants' violation.

95.     As a further proximate result of the above-mentioned acts, the Plaintiff has suffered humiliation, mental pain and anguish, all to the Plaintiff's damage.

96.     The above-mentioned acts of Defendants were willful, wanton, malicious, and oppressive, and justify the awarding of exemplary and punitive damages.

## COUNT SEVEN
## INTENTIONAL INTERFERENCE WITH ADVANTAGEOUS/ CONTRACTUAL RELATIONSHIP

### <u>Plaintiff v. Defendants Barlow, Piper and Fetten</u>

97.     The Plaintiff refers to the allegations of Paragraphs 1 through 96, and by such reference repleads and incorporates them as though fully set forth here.

98.     The Defendants' conduct reflected a deliberate effort by the Defendants to interfere with the Plaintiff's employment relationship with the Defendant Ledvance and knowingly attempted to induce a breaking of that relationship.

99.     The Defendants' interference, in addition to being intentional, was improper in motive or means.

100.    The Plaintiff was harmed by Defendants' actions.

101.   As a direct and proximate result of the acts and omissions of Defendants, the Plaintiff has been and continues to be damaged in an amount to be determined at trial, including costs, interest and reasonable attorney's fees.

## COUNT EIGHT
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### Plaintiff vs. Defendants Barlow, Piper and Fetten

102.   The Plaintiff incorporates by reference as if fully requested herein the allegations contained in paragraphs 1 through 101 of the Complaint.

103.   Defendants Barlow, Piper and Fetten's intimidating and intentional conduct reflected a deliberate effort by these Defendants to inflict emotional distress upon the Plaintiff.

104.   Defendants observed and were otherwise aware of the Plaintiff's emotional distress caused by Defendants' mistreatment, but such infliction of emotional distress nonetheless continued.

105.   The Plaintiff was harmed by Defendants' actions.

106.   As a proximate result of the above-mentioned acts, the Plaintiff has suffered humiliation, mental pain and anguish, all to the Plaintiff's damage.

107.   The above-mentioned acts of the Defendants were willful, wanton, malicious, and oppressive, and justify the awarding of exemplary and punitive damages

## COUNT NINE
## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### Plaintiff vs. Defendant Ledvance

108.   The Plaintiff incorporates by reference as if fully requested herein the allegations contained in paragraphs 1 through 107 of the Complaint.

109.   Defendant Ledvance's conduct, as discussed above, reflected bad faith and breached the implied covenant of good faith and fair dealing between Defendant Ledvance and the Plaintiff.

110.   The Plaintiff was harmed by Defendant's actions.

111.   As a proximate result of the above-mentioned acts, the Plaintiff has suffered humiliation, mental pain and anguish, all to the Plaintiff's damage.

112.   The above-mentioned acts of the Defendants were willful, wanton, malicious, and oppressive, and justify the awarding of exemplary and punitive damages

## COUNT TEN

### MASSACHUSETTS WAGE ACT

#### Plaintiff v. All Defendants

113.  The Plaintiff incorporates by reference as if fully requested herein the allegations contained in paragraphs 1 through 112 of the Complaint.

114. The Defendants failed to pay the Plaintiff earned wages, including but not limited to, approximately $27,115.38 in earned wages.

115. The Defendants' actions, as stated above, constitute violations of the Massachusetts Wage Act.

116. At no time have the Defendants paid the Plaintiff the wages due to him, and accordingly, the Plaintiff filed a complaint with the Massachusetts Attorney General's Office and on or about December 5, 2022, and the Plaintiff subsequently received a private right of action letter for his claim.

## JURY DEMAND

The Plaintiff demands a trial by jury on all issues raised on all counts and in this Complaint.

WHEREFORE, the Plaintiff demands judgment against the Defendants as follows:

a.    That actual damages be awarded to the Plaintiff;

b.    That compensatory damages be awarded to the Plaintiff;

c.    That punitive damages be assessed against the Defendants;

d.    That the Plaintiff be awarded the costs of this action;

e.    Reasonable attorney's fees; and

f.    Such other and further relief as the court may deem necessary and proper.

Respectfully Submitted,
PLAINTIFF, AHMED EISSA,
By His Attorney,

/s/ Helen G. Litsas

_____

Helen G. Litsas, BBO No. 644848

**LAW OFFICE OF HELEN G. LITSAS**
22 Mill Street, Suite 408
Arlington, MA 02476
TEL: 781-646-1518
CELL:617-596-5561
FAX: 781-643-1126

Case 1:21-cv-11155-NMG   Document 58-1   Filed 06/30/23   Page 15 of 15